UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

      :

**BARRY FITZGERALD,**      :

      :

                 Plaintiff,      :

      :   **MEMORANDUM DECISION AND
ORDER**

            – against –      :

      :   22-CV-3410 (AMD) (LKE)

**SODEXO INC.** and **NY PRESBYTERIAN
QUEENS,**      :

      :

                 Defendants.      :

------------------------------------------------------------- X

**ANN M. DONNELLY,** United States District Judge:

      The plaintiff, proceeding *pro se*, brings this action against his former employer, Sodexo

Inc., and NewYork-Presbyterian Queens ("NYPQ"), seeking damages under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). The plaintiff alleges claims

for race and color discrimination and retaliation. Before the Court is the defendants' motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow,

the defendants' motion is granted.

<h3 style="text-align:center">BACKGROUND[1]</h3>

      From May 2018 to March 19, 2021, the plaintiff, a Black man (ECF No. 1 at 15), was a

valet parking attendant for Sodexo assigned to NYPQ, a hospital in Flushing, New York (ECF

No. 61, Defendants' Rule 56.1 Statement ("Defs. R. 56.1") ¶¶ 2, 10). He was responsible for

parking employees' and visitors' cars. (Defs. R. 56.1 ¶¶ 3, 10; ECF No. 58-2, Deposition

Transcript of Barry Fitzgerald ("Fitzgerald Dep.") 49:08-09.)

---

[1] Unless otherwise noted, the factual background is based on the Court's review of the entire record,
including the defendants' 56.1 statement. The Court construes the facts in the light most favorable to
the plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir.
2015).

Although the plaintiff worked at the hospital, the hospital did not employ him.  Rather, Sodexo, an independent contractor that operated parking and valet services for the hospital, employed the plaintiff.   (Defs. R. 56.1 ¶¶ 6–8.)  The plaintiff reported directly to Bankim Parekh, a Sodexo general manager, for the entirety of his employment.  (*Id.* ¶¶ 12, 16.)

The plaintiff alleges six instances of discrimination from April 2019 to March 2021. (ECF No. 1 at 4–5, 15.)

## I.    April 2019: Incident with Manager Bankim Parekh

The plaintiff alleges that in April 2019, Parekh "elbowed [him] in the stomach which was reported but nothing was done by upper management."  (ECF No. 1 at 17; *see also* ECF No. 74 ("My supervisor [Bankim Parekh] elbowed me and bumped my shoulder[.]  [N]othing was done, in result I lost my job.").)[2]  According to the plaintiff, Parekh asked "Jonathan," a Sodexo employee, to work overtime.  (Fitzgerald Dep. 62:18–62:22.)  When the plaintiff offered to do it, Parekh said, "Shhh . . . I got it."  (*Id.* 62:20–63:03.)  Parekh also asked another employee, "Alex," if he could work overtime.  (*Id.* 63:03-05.)  Alex agreed.  (*Id.*)  As Parekh "walked off," he elbowed the plaintiff in the "gut."  (*Id.* 63:04-07.)  The plaintiff asked, "Yo, why would you even do that?"  (*Id.* 63:07-08.)

The plaintiff reported the incident to Bill Kelly, a Sodexo employee "higher than [Parekh]," who instructed the plaintiff to submit a statement.  (*Id.* 67:11-15.)  The plaintiff filed a statement (*id.* 68:05-09) but does not specify whether he reported that Parekh elbowed him because of his race or national origin.  The plaintiff testified at his deposition that he did not know why Parekh elbowed him, but Parekh did not elbow anyone else.  (*Id.* 67:05-06; 69:06-07.)

---

[2] The defendants do not discuss the April 2019 incident in their Rule 56.1 statement.  They argue in their motion that that the "Plaintiff is unable to offer any evidence that [Bankim] Parekh hit him, and if he did, it was because of his race or color."  (*See* ECF No. 62 at 14.)

## II.    June 2020: Incident with Doctor Daniel Skupski

On June 4, 2020, between 12:00 p.m. and 12:30 p.m., Daniel Skupski, an NYPQ doctor, made a hand gesture at the plaintiff near the NYPQ emergency room.  (Defs. 56.1 ¶ 26.) The next day, the plaintiff told Parekh that he said, "Hi," to Dr. Skupski, who mimicked pointing a gun at the plaintiff.  (*Id.* ¶ 27.)  Parekh told the plaintiff to submit a statement about the incident.  (*Id.* ¶ 28.)  The plaintiff first went to NYPQ human resources who directed him to William Kelly, Sodexo Client Executive I.  (*Id.* ¶ 29.)  The plaintiff, Kelly, and Parekh had a conversation about the incident.  (*Id.* ¶ 30.)

On June 9, 2020, the plaintiff submitted a written complaint to Kelly, Parekh, and the Sodexo human resources department.  (*Id.* ¶ 31.)  As part of Sodexo's investigation into the plaintiff's complaint, Kelly, Parekh and the plaintiff watched the security footage of the encounter.  (*Id.* ¶¶ 32–33.)  The video showed that Dr. Skupski walked past the plaintiff and a co-worker, Raul Laguna, and made a hand gesture toward both of them.  (*Id.* ¶ 34.)  Dr. Skupski did not appear to mimic shooting a gun.  (*Id.* ¶ 35.)[3]  Nor did the plaintiff appear to be distressed; rather, he and Laguna were smiling.  (*Id.* ¶ 36.)[4]

In August 2020, Parekh told the plaintiff in a series of text messages that Dr. Skupski wanted to meet with him to resolve the plaintiff's concerns.  (*Id.* ¶ 37.)  In an August 17, 2020 message, Parekh told the plaintiff that Dr. Skupski was "looking forward to seeing you to resolve the issue with him."  (*Id.* ¶ 38.)  The next day, Parekh advised the plaintiff by text message that the plaintiff could give Parekh "at least two different times of your arrival and I can set up your

---

[3] The plaintiff watched the surveillance video at his deposition, and testified that he saw Dr. Skupski "tap[] his waist two to three times and the third time he used his finger as a gun."  (Fitzgerald Dep. 102:11-13.)

[4] While the plaintiff agreed he did not appear to be traumatized on the video, he asked how trauma could "be visible."  (*Id.* 103:17-19 ("How can [the trauma] be visible? With that being said, no.  No, it's not visible.").)

appointment with Dr. Skupski.  Or else if you agree, I can give you what time Dr. Skupski is available." (*Id.* ¶ 39.)  Daria Mauro, an employee relations senior manager at Sodexo, invited the plaintiff to meet with Dr. Skupski to discuss the plaintiff's complaint.  (*Id.* ¶ 40; ECF No. 58-3 (Ex. C, Aug.18, 2020 letter from Daria Mauro to the plaintiff).)  The plaintiff declined in a letter, saying that he did not "feel safe around [Dr. Skupksi]" and would meet with him "only if an NYPD police officer can be present."  (ECF No. 58-4 (Ex. D, Aug. 19, 2020 letter from the plaintiff to Daria Mauro).)  At that point, Sodexo closed its investigation, because it could not substantiate the plaintiff's allegations.  (Def. 56.1 ¶ 42.)  The plaintiff alleges that he was "blackballed, with write ups and disciplinary [sic] charges" for complaining to the hospital and Sodexo.  (ECF No. 1 at 5.)  The plaintiff stated at his deposition that "blackballed" meant that "all of them started ganging up on [him]" "[f]or speaking up" and that "they w[ere] all working together to get rid of [him]."  (Fitzgerald Dep. 191:18–192:12.)  The plaintiff declined to name who was "ganging up" on him.  (*Id.* 190:05–191:09.)

### III.    The Plaintiff's Comments About His Co-Workers

On December 16, 2020, the plaintiff referred to his co-workers as a "Spanish gang" and "racists."  (Defs. 56.1 ¶ 43.)  Parekh signed a January 15, 2021 written warning describing the incident: "[I]t was reported that you engaged in an inappropriate discussion with a customer regarding your co-workers.  This included calling your co-workers a 'Spanish gang' and 'racists[.']"  (ECF No. 59-5 at 2.)

The plaintiff said at his deposition that he had the "gang" conversation with the "People Center" (Fitzgerald Dep. 79:20:23), but he does not say what the People Center is or identify to whom he spoke.[5]  He contacted the People Center because, "after [Parekh] elbowed [him] and

---

[5] The plaintiff refused to explain what the People Center was and could not recall to whom he spoke at the People Center.  (*See, e.g., id.* 74:14-18 ("Q. . . . What's the People Center?  A.  You a Sodexo lawyer.

. . . Kelly told [him] to write a statement and things didn't get handled the way [he] thought that things should have been handled, every chance [he] felt like [he] should have reached out to people [who] have more authority." (*Id.* 80:02:11.) The plaintiff did not deny referring to his co-workers as a "Spanish gang" and "racists." (Defs. R. 56.1 ¶ 45.) "I said they ganging up on me. They was — no, I said they moving like a gang because they all was moving on one union — one unit. They was all moving together[,] [i]ncluding [Parekh], even Paul." (Fitzgerald Dep. 77:22–78:08.) According to the written warning, the plaintiff "admitted to making the comment" "[i]n an interview with HR on 1/13/21." (ECF No. 59-5 at 2.) The written warning stated, "This will be considered a final warning and any future policy violations or negative conduct may be addressed with action up to and including termination." (*Id.* at 3.)

## IV.    Requests for Overtime

The plaintiff's typical work schedule was 12:00 p.m. to 8:30 p.m. (Defs. 56.1 ¶ 46.) He claims that he asked Parekh several times if he could work overtime (*id.* ¶ 47), but he does not say when he made these requests. Parekh declined the plaintiff's request to start work at 10:00 a.m. (*id.* ¶ 41) because NYPQ rarely needed valet services at 10:00 a.m. (*id.* ¶ 48). After the June 4, 2020 incident with Dr. Skupski, the plaintiff refused to work on Saturdays. (*Id.* ¶ 49.)

The plaintiff also alleges that his "workload increased compared to other staff" (ECF No. 1 at 5), but he does not say when this happened. The plaintiff testified at his deposition that his coworkers were "ganging [up] on [him]" and "provide[d] a lot of cars for [him] to move when it[] [was] [his] turn to move the cars or when it was [his] time to do key log," which involved

---

You know what the People Center is. This is why I need a lawyer."); *id.* 76:03-11 ("Q. Did you speak with someone at the People Center about the elbowing incident? A. It's plenty of people I spoke to [at] the People Center. I can't recall exactly[.] . . . you would have to check with them on their end.").)

"keep[ing] inventory of what car is what" and "mak[ing] sure the keys [are] here." (Fitzgerald Dep. 186:12–188:08.)

## V.     March 19, 2021: Termination of the Plaintiff's Employment

On March 19, 2021, Parekh asked the plaintiff to read and sign driver safety documents that all valet attendants were required to sign (Defs. 56.1 ¶ 50), but the plaintiff refused (*id.* ¶ 51). Parekh told the plaintiff that he should sign out and go home if he would not sign the documents. (*Id.* ¶ 52.) Instead, the plaintiff went to the NYPQ security office, where he was "disruptive" and shouted at the employees; he demanded a copy of the video footage of the June 2020 incident involving Dr. Skupski. (*Id.* ¶¶ 53, 54.) The employees refused to give him the footage. (*Id.* ¶ 55.)

Next, the plaintiff followed a NYPQ staff member into a restricted area. (*Id.* ¶ 55.)[6] An NYPQ employee escorted the plaintiff to a conference room to wait for security. (*Id.* ¶ 57; ECF No. 59-6 (Ex. F, Termination Notice).) When the plaintiff demanded a copy of the security video, he was told he could not have it. (Defs. 56.1 ¶¶ 58, 59; ECF No. 59-6 (Ex. F, Termination Notice).) The plaintiff, "in a loud and boisterous manner[,] accused the hospital director of security of being a racist." (Defs. 56.1 ¶ 60.) Security then escorted the plaintiff out of the hospital and told him not to return unless he was told to do so. (*Id.* ¶ 61.)

On March 19, 2021, Sodexo placed the plaintiff on investigatory suspension. (*Id.* ¶ 62.) Shortly after, on March 25, 2021, Sodexo terminated the plaintiff's employment effective March 19, 2021 (*id.* ¶ 63) for acting in a "disruptive, unprofessional and inappropriate" manner and

---

[6] According to the defendants, the plaintiff told an employee that he had an appointment. (Defs. 56.1 ¶ 56.) The plaintiff denied at his deposition that he said he had an appointment and said that he "told them [he] was trying to find somebody. The person that was in the video — the picture with so the situation could have been handled, dealt with the right way." (Fitzgerald Dep. 152:24–153:07.) The plaintiff did not know the name of the person for whom he was looking but thought he was the "head honcho." (*Id.* 156:14–157:02.)

"entering NYPQ's administrative offices without authorization (*id*. ¶ 64). In a termination

notice, Sodexo gave the following explanation for terminating the plaintiff's employment:

> Bankim Parekh, General Manager along with [other employees] attempted to provide you with several driver/valet documents that are to be signed by all valet and shuttle employees. When [Parekh] approached you to sign the documents you became loud and boisterous refusing to sign the documents and you began to walk away. . . . Bankim told you this matter was about driver safety. . . . Bankim . . . told you that, what was being asked of you was a reasonable request and if you will not sign the documents you should sign out and go home. You then stated very loudly, "I am not going anywhere do what you have to do[."] Bankim then called security for assistance. . . . At approximately 1:30PM you went to our clients security office demanding a copy of the video involving the incident with the doctor in June on 2020. . . . You were told that they would not provide you a copy of the security video. You [were] loud and boisterous accusing the hospital director of security [of] being a racist. At that point, you were escorted out of the building and told not to return unless you were told to do so. As a result of your actions and behavior, the client has determined that you are no longer allowed on hospital propriety at any time, for any reason.

(ECF No. 59-6 (Ex. F, Termination Notice).) NYPQ was not involved in the plaintiff's

termination. (Defs. 56.1 ¶ 19.)[7]

The plaintiff maintains that he was fired because he asked for the video of the June 2020

incident. He testified at his deposition:

> I asked for the video but they telling me that I need a lawyer to receive the video. I was trying to find a lawyer, couldn't get a lawyer, so I kept on fighting to get the video, and best believe by me doing that, I ended up getting terminated.

(Fitzgerald Dep. 247:25–248:07.)

---

[7] The plaintiff testified that he got fired partly because NYPQ told Sodexo that "[he] did this and did that . . ." (*Id.* 168:11-23; *see also id*. 168:16-21 ("Q. So New York Presbyterian provided factual information that Sodexo — A. Correct. People picking and choosing what they wanna do. See and don't see. It's not what you know. It's who you know.").)

## VI.    Procedural Background

On September 9, 2021, the plaintiff filed a charge of discrimination with the New York

State Division of Human Rights ("NYSDHR") and Equal Employment Opportunity Commission

("EEOC") alleging that he "was treated differently because of [his] race (Black) and national

origin (African American)."  (Defs. 56.1 ¶ 4; ECF No. 1 at 14–19.)  The EEOC issued the

plaintiff a right-to-sue letter on April 29, 2022.  (ECF No. 1 at 8.)

On June 7, 2022, the plaintiff filed this action alleging Title VII claims for race and color

discrimination and retaliation from April 2019 to March 2021.  (*Id.* at 5.)  He seeks

"[d]amages . . . for financial compensation for harassment, discrimination and [from] being

terminated from his position [and] being hit by [his] general manager."  (*Id.* at 6.)

## LEGAL STANDARD

## I.    Summary Judgment

The defendants move for summary judgment on the plaintiff's Title VII claims for race

and color discrimination and retaliation under Federal Rule of Procedure 56.  (ECF No. 56.)

A party can prevail on summary judgment only if the submissions, including deposition

transcripts, affidavits, or other documentation show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[8]

---

[8] The Court does not consider the plaintiff's notes (ECF No. 65 at 15, 17–20, 25, 27–48), which he appears to have taken on a cell phone, because the notes are unsworn, and are hearsay to which no exception applies.  *See Hudson v. Fischer*, No. 06-CV-1534, 2008 WL 5110974, at *9 (N.D.N.Y. Dec. 2, 2008) (declining to consider "151 page handwritten 'log book'" on a motion for summary judgment "in which Plaintiff purportedly recorded the events" during which her coworkers created a hostile work environment and finding the log book constituted hearsay and that "Plaintiff does not offer an exception to the hearsay rule"); *see also Jean v. Acme Bus Corp.*, No. 08-CV-4885, 2012 WL 4171226, at *5 (E.D.N.Y. Sept. 19, 2012) (observing that, to be admissible, "an affidavit must be sworn to before an officer authorized to administer oaths, such as a notary public" or, if it is unsworn, it must be "made under penalty of perjury" and "include[] language in substantially the same form as 'I declare (or certify, verify, or state) that the foregoing is true and correct' followed by a signature and date of execution." (citations omitted)).

A "genuine" dispute arises when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law" qualify as "material," and "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id.* The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Strass v. Costco Wholesale Corp.*, No. 14-CV-6924, 2016 WL 3448578, at *2 (E.D.N.Y. June 17, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In determining whether there are genuine disputes as to any material facts, a court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (cleaned up). The non-moving party will prevail "only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) ("Once the moving party has met [its] burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party

to demonstrate that there is a genuine issue for trial." (citing *Celotex*, 477 U.S. at 324)).  "[A] court will not entertain inadmissible hearsay unsubstantiated by any other evidence on ruling on a summary judgment motion."  *Mattera v. JPMorgan Chase Corp*, 740 F. Supp. 2d at 566 n.2 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Given the "'elusive nature of intentional discrimination,' plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'"  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (cleaned up) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)).  Accordingly, "[b]ecause of the likelihood that direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Banks*, 81 F.4th at 259 (cleaned up) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  "The resulting 'mosaic of intentional discrimination' may be sufficient to show discrimination."  *Banks*, 81 F.4th at 259 (cleaned up) (quoting *Vega*, 801 F.3d at 86).  "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment."  *Banks*, 81 F.4th at 259 (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

"The fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  It is incumbent upon the district court to "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of

production even if the statement is unopposed." *Jackson v. Federal Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (citing *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "In doing so, the court may rely on other evidence in the record even if uncited." *Jackson*, 766 F.3d at 194.

"[Courts] are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned." *Id.* at 195 (citation omitted). "[S]ummary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion*, 76 F.3d at 486. The movant must provide the *pro se* litigant with a written statement expressly warning him that he cannot simply rely on the complaint, and that, if he does respond, the Court will accept the movant's facts as true and summary judgment may be granted against him without trial. *Id*.

In this case, the defendants properly served the plaintiff with the requisite warning that he "may NOT oppose summary judgment simply by relying upon the allegations in [his] complaint," but must "submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support [his claim]." (ECF No. 57 (emphasis in the original).) The defendants also served the plaintiff with the full text of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (ECF Nos. 57-1, 57-2.)[9] The plaintiff submitted a two-page "Rule 56.1 Counterstatement" in which he does not specifically deny any of the statements in the defendants' 56.1 statement, and states that the "purpose of the case was

---

[9] Magistrate Judge Cheryl L. Pollak directed the plaintiff to file an opposition to the defendants' motion for summary judgment by August 5, 2024. (*See ECF Order dated June 10, 2024.*) On December 18, 2024, the Court *sua sponte* extended the deadline for the plaintiff to file an opposition along with his Rule 56.1 statement to January 20, 2025. (*See ECF Order dated Dec. 18, 2024.*) The Court reminded the plaintiff that its "Individual Practice Rule 4(B)(i) states: 'The counterstatement must include each of the movant's allegations, verbatim, and the opposing party must place its responses immediately beneath each of the movant's statements of fact. The counterstatement may, if necessary, include a separate section of additional material facts alleged to be in dispute.'" (*Id.*)

not disputed or reviewed." (ECF No. 74 at 4.) The plaintiff also filed, without explanation, an assortment of unmarked exhibits (ECF Nos. 65, 78) — including blurry and partial snapshots of filings in this case, correspondence with defense counsel, timesheets, work schedules, text messages, publications related to the death of George Floyd and the Civil Rights movement, a "key log schedule," and photographs of what appear to be his former worksite at the hospital and bruises on his hip. "Accordingly, any of Defendant[s'] Rule 56.1 Statements that are properly supported, but which Plaintiff does not specifically deny with requisite citations to admissible evidence, are deemed admitted for purposes of Defendant[s'] summary judgment motion." *White v. Roosevelt Union Free Sch. Dist. Bd. of Educ.*, No. 15-CV-1035, 2025 WL 552744, at *2 (E.D.N.Y. Feb. 19, 2025) (citing Local Civ. R. 56.1(c)); *see also Manolis v. Brecher*, No. 11-CV-2750, 2014 WL 642849, at *3 (S.D.N.Y. Feb. 14, 2014) ("[The plaintiff's] status as a *pro se* litigant does not relieve her of the duty of complying with federal and local rules" and "the special solicitude frequently afforded to *pro se* litigants does not excuse [a plaintiff's] failure to comply with the requirements of Local Rule 56.1.").

## DISCUSSION

### I.    Title VII Claim for Race and Color Discrimination[10]

In order to prevail on a Title VII discrimination claim, an employee must show that he: (1) belongs to a protected class; (2) was qualified for the position held; and (3) suffered an adverse employment action that (4) occurred under circumstances giving rise to an inference of discrimination. *Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 162 (E.D.N.Y. 2020) (citing *Holcomb*, 521 F.3d at 138). Under the burden shifting framework established in

---

[10] Because the Court finds the defendants are entitled to summary judgment on other grounds, the Court does not address the defendants' argument that NYPQ should be dismissed as a defendant because NYPQ was not the plaintiff's employer under the single employer or joint employer theory. (*See* ECF No. 62 at 9–16.)

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff bears the initial burden of "establish[ing] a *prima facie* case of discrimination," although this burden "is a minimal one." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). If that showing is made, the "burden of production then shifts to defendant to offer a non-discriminatory reason for the employment action." *Kern v. Brookhaven Nat'l. Lab'y*, 293 F. Supp. 2d 214, 218 (E.D.N.Y. 2003). A valid non-discriminatory reason will defeat the initial presumption of discrimination and requires the plaintiff to then "show that the reason offered by defendant is a pretext for discrimination." (*Id.*)

The plaintiff seems to allege six discrete acts of discrimination: (1) the April 2019 incident involving Parekh; (2) the June 2020 incident involving Dr. Skupski; (3) the denial of overtime hours; (4) an increased workload relative to other staff; (5) that he was "blackballed, with write ups and disciplinary [sic] charges"; and (6) the termination of his employment. The defendants do not dispute that the plaintiff has satisfied the first three elements — membership to a protected class, qualification to hold the position, and adverse employment action. Rather, the defendants argue that at least three of the six discrete acts are time-barred and the record does not show that any of the six acts gives rise to an inference of race or color discrimination. (ECF No. 62 at 17–19.)

a.    **Statute of Limitations**

Title VII claims for discrimination and retaliation must be filed with an administrative agency within 300 days of the alleged discriminatory act to be timely. 42 U.S.C. § 2000e-5(e); *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 76 (2d Cir. 2003). "A plaintiff may not recover for claims of discrimination based on discrete acts that occurred outside of the [300-day] statutory period, 'even when they are related to acts alleged in timely filed charges.'" *Johnson v.*

*City of New York*, No. 17-CV-7585, 2019 WL 4468442, at *6 (E.D.N.Y. Sept. 18, 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002)).  Discrete acts include, for example, termination, disciplinary action, failure to offer overtime hours, failure to compensate adequately, and denial of preferred job assignments.  *See Johnson*, 2019 WL 4468442, at *6 (citations omitted).

The plaintiff filed a charge of discrimination with the NYSDHR and EEOC on September 9, 2021.  (Defs. 56.1 ¶ 4.)  Accordingly, the plaintiff's Title VII claims based on discrete acts that occurred before November 11, 2020 are time-barred.  The time-barred acts include (1) the April 2019 incident involving Parekh and (2) the June 2020 incident involving Dr. Skupski.  In a sworn declaration, Parekh states that "[a]t certain points during his employment Plaintiff requested overtime from me, but only if he could start work at 10:00 a.m. instead of noon" (*id.* ¶ 47; ECF No. 59 (Bankim Parekh Declaration ¶ 41)); the parties do not specify the dates of the plaintiff's overtime requests.  Therefore, nothing in the record shows that the plaintiff's requests for overtime are time-barred.

### b.    Inference of Discrimination

An employee can establish an inference of discrimination if "the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham*, 230 F.3d at 39.  If the defendant offers legitimate nondiscriminatory reasons for its adverse action, the employee must establish pretext by offering "evidence from which a reasonable jury could conclude by a preponderance of the evidence that discrimination played a role in the adverse action taken by the defendant."  *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *15 (E.D.N.Y. Sept. 24, 2014) (citing *Holcomb*, 521 F.3d at 141).  Where a plaintiff's allegations are "vague and conclusory," a Title

VII discrimination claim will not survive.  *See, e.g.*, *Taveras v. City of New York*, No. 06-CV-3807, 2009 WL 10701924, at *9 (E.D.N.Y. Apr. 7, 2009) (dismissing a national origin discrimination claim because "vague and conclusory allegations are insufficient to give rise to an inference of discrimination"); *Ramos v. N.Y.C. Dep't of Corr.*, No. 05-CV-223, 2006 WL 1120631, at *7 (E.D.N.Y. Apr. 26, 2006) (same).

The plaintiff claims that the defendants discriminated against him based on his race and the "color of [his] skin."  (ECF No. 1 at 5.)  Yet nothing in the record supports a finding that any of the six acts give rise to an inference of discrimination on those bases.  The plaintiff alleges that his supervisor Parekh — who was involved in the April 2019 incident, investigation of the June 2020 incident, denial of overtime hours, and termination of the plaintiff's employment — is "Indian."  (*Id.* at 15.)  He alleges that Dr. Skupski, who was involved in the June 2020 incident, is "White."  (*Id.*)  Two of his co-workers — "Nascio," who is "Dominican," and "Mr. Singh," who "shares [Parekh's] ethnicity" — received overtime hours.  (*Id.*)  "George," who is "Hispanic," "crashed a lady[']s car and is still employed, while [the plaintiff] was let go for asking for . . . a copy of a video."  (*Id.*)  Although the plaintiff's initial burden to establish an inference of discrimination is low, the record must contain more than "vague and conclusory" allegations.  *Taveras*, 2009 WL 10701924, at *9; *see also Diaz v. Poly Prep Day Sch.*, No. 21-CV-6611, 2022 WL 2803259, at *1 (E.D.N.Y. July 18, 2022); *Rosario v. Hilton Worldwide, Inc.*, 2011 WL 336394, at *4 (E.D.N.Y. Jan. 24, 2011) (granting summary judgment to employer because plaintiff's "gut feelings, however genuine, do not allow for an inference of discrimination to be drawn").  Because the record does not support an inference of discrimination, the plaintiff has not satisfied the fourth element of his Title VII discrimination claim and the defendants are entitled to summary judgment.

## II.    Title VII Claim for Retaliation

An employee claiming retaliation must show that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  As with a Title VII discrimination claim, the plaintiff bears the "minimal" initial burden of establishing a retaliation claim.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  If the plaintiff meets that burden, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.*  If the "employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Id.*

There is no dispute that the plaintiff engaged in a protected activity, that the employer was aware of the protected activity, and that the plaintiff suffered a materially adverse action. The defendants contend that the plaintiff has not established a causal connection between the protected activity (the plaintiff's written complaint about Dr. Skupski) and the materially adverse action (the termination of the plaintiff's employment).  (ECF No. 62 at 24–25.)

### a.    Causation

A "causal connection" in a retaliation claim can be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (citation omitted).  "[T]here is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break

the causal inference." *Thomas v. Amazon.com Servs. LLC*, No. 23-CV-1271, 2025 WL 253276, at *12 (E.D.N.Y. Jan. 21, 2025) (citation omitted); *see also Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) ("The time lapses between Brown's protected activities and the alleged retaliatory acts — ranging from two months to several years — were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations.").

In June 2020, the plaintiff filed a complaint about his encounter with Dr. Skupski. (ECF No. 62 at 24.) There is no evidence that the defendants retaliated against the plaintiff because he complained. On the contrary, Sodexo investigated the complaint and reviewed the security footage with the plaintiff. (Defs. 56.1 ¶¶ 32, 33.) Parekh and Daria Mauro also tried to set up a meeting between the plaintiff and Dr. Skupski, which the plaintiff declined. (*Id.* ¶ 40; ECF No. 58-3 (Ex. C, Aug. 18, 2020 letter from Daria Mauro to the plaintiff).) Moreover, nine months passed before the plaintiff was fired, which is too long to support an indirect causal connection between the complaint and the termination. *See McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.*, 788 F. Supp. 2d 78, 83 (E.D.N.Y. 2011).

The record shows that the plaintiff was fired not because he complained about Dr. Skupski, but because of his "loud and boisterous" behavior on March 19, 2021, when he refused to sign driver safety documents, "demand[ed] a copy of the video" of the June 2020 incident, and "accus[ed] the hospital director of security [of] being a racist." (ECF No. 59-6 (Ex. F, Termination Notice).)

The plaintiff has not offered any "direct" evidence of "retaliatory animus," or established a causal connection between protected activity and his termination. *See Littlejohn*, 795 F.3d at 319. Accordingly, the defendants are entitled summary judgment.

## CONCLUSION

For these reasons, the defendants' motion for summary judgment is granted.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      March 19, 2025